**KELLER BENVENUTTI KIM LLP**
JANE KIM (Cal. Bar No. 298192)
(jkim@kbkllp.com)
JEREMY V. RICHARDS (Cal. Bar No. 102300)
(jrichards@kbkllp.com)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>TRINITAS FARMING, LLC, *et al.*,[1]<br><br>               Debtors. | Case No. 24-50210 (___) (Lead Case)<br><br>Chapter 11<br><br>(Joint Administration Requested)<br><br>**DECLARATION OF KIRK HOIBERG IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS** |

---

[1] The last four digits of Trinitas Farming, LLC's tax identification number are 8883. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.donlinrecano.com/trinitas. The Debtors' service address is 1414 East F Street A-102, Oakdale, California 95361.

I, Kirk Hoiberg, do hereby declare as follows:

1.      I am a Manager of Trinitas Partners, LLC, a California limited liability company ("Trinitas Partners"), a leading sponsor, manager, and operator of agricultural investments in California's Central Valley. Trinitas Partners is the manager of Trinitas Advantaged Agriculture Partners IV GP, LLC, a California limited liability company ("Trinitas GP"), the general partner of Debtor Trinitas Advantaged Agriculture Partners, IV, LP, a limited partnership organized under the laws of Delaware ("TAAP IV"), which in turn is the sole member and manager of the following wholly owned subsidiaries (collectively, the "Debtor Farm Subsidiaries" and, together with TAAP IV and TF (defined below), collectively, "Trinitas Farming," the "Company," or the "Debtors"), all of which, including TF, are formed under the laws of the State of California: Dixon East LLC; Turf Ranch LLC; Rasmussen LLC; Johl LLC; Chiala LLC; Hall Ranch LLC; Porterville LLC; Tule River Ranch, LLC; Dinuba Ranch, LLC; Jeffrey Ranch, LLC; Toor Ranch, LLC; Lamb Ranch, LLC; Fry Road, LLC; Adobe Ranch, LLC; Marucci Ranch, LLC; Ratto Ranch, LLC; and Phelps Ranch, LLC. TAAP IV is also the sole member of Debtor Trinitas Farming, LLC ("TF"), which is managed by Trinitas Partners.

2.      I have over 25 years of experience in leading privately held companies, including four from start-up. From 1992 to 1998, I was President of MixStar Incorporated, a business-to-business vertical market application serving the residential mortgage banking industry and the first business-to-business application on America Online. From 2001 to 2003, I was a Senior Associate and Engagement Manager at McKinsey & Company. From 2003 to 2008, I was Senior Managing Director within CB Richards Ellis' Global Corporate Services business unit, which managed over 1.3 billion square feet of commercial real estate on behalf of Fortune 500 companies, and which acquired Trammell Crow for over $2 billion in 2006. I was also a founding employee of GoldPocket Interactive, which was eventually sold in 2006 to Tandberg. I graduated *summa cum laude* from Claremont McKenna College with degrees in economics and mathematics and received my MBA from Harvard Business School with High Distinction as a Baker Scholar.

3.      In 2008, I co-founded Trinitas Partners, a private equity investment company, and I have served as a Manager of Trinitas Partners since its founding. Trinitas Partners also serves as

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

an advisor to TAAP IV pursuant to an advisory agreement. As such, I am generally familiar with the day-to-day operations of all of the Debtors and their affairs, books, and records.

4.      I submit this declaration pursuant to 28 U.S.C. § 1746 in support of the First Day Motions (as defined below). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management, employees, and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized by the Debtors to submit this declaration.

5.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California, thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

6.      To minimize the adverse effects of filing for bankruptcy protection on their businesses, the Debtors have filed several motions requesting various types of "first day" relief (collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors-in-possession. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful resolution to these Chapter 11 Cases, and (c) best serves the Debtors' estates and creditors' interests.

7.      Part I of this declaration describes the Debtors' businesses, their secured and unsecured debt, and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II summarizes the relief requested in each First Day Motion and the facts supporting those requests.

I.

**DEBTORS' BACKGROUND AND EVENTS LEADING UP TO CHAPTER 11**

**A.    Overview of Debtors' Business and History**

8.    Debtor TAAP IV is an investment vehicle that was organized by Trinitas Partners in 2015 to acquire, develop, cultivate, and operate primarily almond ranches in the Central Valley of California.  TAAP IV owns, and through its subsidiary, Debtor TF, operates 17 almond ranches, each of which is held by a separate Debtor Farm Subsidiary, covering 7,856 planted acres in Solano, Contra Costa, San Joaquin, Fresno, and Tulare Counties.  Pursuant to an advisory agreement, *inter alia*, Trinitas Partners is entitled to receive a management fee based on committed capital, which fee, prior to the Petition Date, had been accrued but not paid for some time.

9.    Because of, among other reasons, Trinitas Partners' significant experience and expertise in managing agricultural investments and operations, the Debtor Farm Subsidiaries' superior water rights, the relatively young age of the almond orchards (which makes the orchards more valuable for long-term growth), advantages in the Debtors' cost-of-production, and the Debtors' sustainability practices, the Debtors were well-positioned to become profitable ventures.

10.    However, as discussed below, high interest rates impacting the Debtors' cost of debt servicing, the substantial capital needed to support almond orchards that are not yet at mature production and the concomitant rising cost of capital, and sustained, record-low almond prices all contributed to the Debtors' serious liquidity constraints.  The Debtors were unable to raise necessary capital, either through investments from TAAP IV's current limited partners and outside investors, or from potential sales of portions of the Debtors' Portfolio (as defined below) to interested prospective purchasers.  Ultimately, as described below, the Debtors, after discussions with their prepetition limited partners and secured lender, Rabo Agrifinance, LLC ("Rabo Ag"), determined that it was in the best interests of the Debtors and their creditors to file these Chapter 11 Cases, to facilitate a managed sale process with debtor-in-possession financing support provided by Rabo Ag.

**KELLER BENVENUTTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

**B.** **The Debtors' Corporate Structure and Business**

11. As noted above, TAAP IV is an investment fund, the general partner of which is Trinitas GP. The vast majority of TAAP IV's equity is held by institutional investor limited partners that are unrelated to any of the members of Trinitas Partners; the limited partners contributed approximately $197 million of capital to TAAP IV. Trinitas Partners also provides advisory services to TAAP IV pursuant to an advisory agreement.

12. In addition to the Debtor Farm Subsidiaries, TAAP IV is also the sole member and manager of non-Debtor South Olive Holdings, LLC ("South Olive"). South Olive owns a 79% interest in WL Olives, LLC, a Delaware limited liability company ("WL Olives" or the "Olive JV"), the remaining 21% of which is owned by Westlake Farms, Inc., a California corporation, which is in turn owned by the family of Ceil Howe III, another principal of Trinitas Partners, or trusts affiliated with Mr. Howe's family. WL Olives is managed by South Olive. A corporate organization chart is attached hereto as **Exhibit 1**.

13. Through the Debtor Farm Subsidiaries and the Olive JV, TAAP IV holds 8,610 planted acres of land (the "Portfolio"). Of these, 3,095 acres are in the "Delta" region (Solano County), 3,218 acres in the "Dixon" region (Contra Costa and San Joaquin Counties), and 1,543 acres in the "Southlands" region (Fresno and Tulare Counties). The balance (754 acres) is comprised of an olive ranch owned by the Olive JV. The current weighted-average age of the Debtors' almond orchards is approximately 4.7 years, which, for almond orchards, is approximately 1-2 years before orchards enter full production. This means the Portfolio is of an age that is attractive for prospective buyers because its full mature productive life is imminent. In agriculture in general, and in California in particular, reliable access to sufficient water at reasonable cost is the most important factor determining operating risk, operating expense, and, therefore, the value of the underlying agricultural asset. The Portfolio assembled and owned by TAAP IV has extremely favorable water rights and competitive water costs. Approximately one-third of the Portfolio holds riparian water rights (granted to the property directly adjacent to the water source), which are far superior to many other water rights in California. The other orchards in the Portfolio are in California water districts with unusually secure rights to sufficient surface

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

water. It is frequently the case that 100% of the Portfolio's water needs are met by surface water. Even during periods where less surface water is available, between 60% and 80% of the Portfolio's water needs are met by surface water, 20-25% by groundwater, and less than 5% from third-party suppliers. Of note, during California's recent historically severe drought, TAAP IV had sufficient water for all of its orchards. In addition to its advantaged water rights, the Portfolio's water costs average less than $100 per acre foot,[2] significantly below the $400-$900 per acre foot market average in many parts of the San Joaquin Valley.

14. Historically, and until shortly before the Petition Date, TF served as a "clearinghouse" for the financial transactions involved in purchasing goods and services for the Debtor Farm Subsidiaries. TF's shared services offered the parties convenience and economies of scale by providing shared vendor arrangements and equipment across multiple properties. TF provided these services at allocated cost, i.e., with no markup or profit to TF. These services include, but are not limited to, farm production management, crop health, agronomy, pest control, harvest, sustainability, equipment/fleet operations, procurement, and finance/accounting.

15. In addition to providing services to the Debtor Farm Subsidiaries, TF provided these services, on a shared, allocated-cost basis (including the allocated cost of TF's payroll), to non-Debtor Pomona Farming LP, a Delaware limited partnership ("Pomona Farming"), which owns almond and other orchards/farms adjacent or close to some of the Portfolio properties. (Trinitas Partners, through its ownership interest in its subsidiary TP Pomona, LLC, owns a small (0.45%) equity interest in Pomona Farming and, through its wholly owned subsidiary Pomona Farming GP, LLC, manages the entity as Pomona Farming's general partner; the remaining 99.55% of Pomona Farming is owned by affiliates of a large Canadian public sector pension fund unaffiliated with the Debtors or Trinitas Partners.) TF provided these services to Pomona Farming pursuant to a Farm Services Agreement dated March 31, 2017 (the "Original Farm Services Agreement"), on the same at-cost terms as those provided to the Debtors. The combined scale of

---

[2] An acre-foot is a customary unit of volume defined as the volume of one acre of surface area to a depth of one foot, commonly used in the United States in reference to large-scale water or soil resources. One acre-foot is equal to 43,560 cubic feet.

**KELLER BENVENUTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

Pomona Farming and the Debtors made it one of California's largest almond growers. By collaborating through TF, especially given the close proximity of many of their respective almond orchards, the Debtors and Pomona Farming were able to generate advantages in procuring goods and services, enjoy various operating efficiencies for farming and operating activities, create various advantages in marketing their almonds, and afford a larger and more highly-skilled team of operating professionals. Until shortly before the Petition Date, TF employed 51 employees who provided these services to the Portfolio properties and Pomona Farming.[3] Because Pomona Farming's portfolio is significantly larger than the TAAP IV Portfolio, as of shortly before the Petition Date, approximately 80% of the services provided by TF were provided to, and paid for by, Pomona Farming ranches; it follows that the vast majority of the work performed by TF's employees was performed for Pomona Farming's properties and paid for by Pomona Farming.

16. In light of the Debtors' financial situation, the Debtors determined that it would be in the Debtors' and their creditors' best interests to reduce ongoing obligations, including to employees, vendors, and Pomona Farming, by terminating TF's employees, having Pomona Farming rehire the same employees, and entering into an Amended and Restated Farm Services Agreement (the "Amended and Restated Farm Services Agreement"), dated February 15, 2024.[4] Pursuant to the Amended and Restated Farm Services Agreement, Pomona Farming provides the same services to the Debtor Farm Subsidiaries and other orchards owned by TAAP IV as were previously provided to Pomona Farming by TF under the Original Farm Services Agreement, on the same at-cost basis and the same or similar terms.

17. On February 18, 2024, after entering into the Amended and Restated Farm Services Agreement, TF terminated all of its employees and provided final paychecks, including all accrued wages, salaries, and paid time off. On February 19, Pomona Farming subsequently rehired all but one of TF's employees (TF's employees were informed of the change in employment and the reason for such change), who will be providing the same services, as Pomona Farming's

---

[3] None of the other Debtors besides TF had or have any employees.

[4] The summary description of the Amended and Restated Farm Services Agreement provided here is qualified by reference to the terms of the Amended and Restated Farm Services Agreement.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

employees, to the Debtors as they provided prepetition to the Debtors as TF's employees. This eliminated TF's payroll obligations, and instead, TF will now be obligated to pay only the portion of Pomona Farming's payroll attributable to services provided to TF and the other Debtors pursuant to the Amended and Restated Farm Services Agreement.

18.     At the same time, Pomona Farming will negotiate and enter into shared vendor arrangements on behalf of Pomona and TF (with each of Pomona and TF liable only for its respective services or materials purchased), instead of TF providing those services to Pomona Farming under the Original Farm Services Agreement, which will reduce obligations to third parties (including obligations that ultimately would be payable by Pomona Farming but are owed directly by TF). Moreover, the Amended and Restated Farm Services Agreement provides that Pomona Farming and TF will cooperate to cause shared vendors to provide that, to the extent possible, each of Pomona Farming and TF will be liable only for its respective services or materials purchased from such vendors, which will further reduce the Debtors' potential obligations. The Debtors intend to continue performing under the Amended and Restated Farm Services Agreement throughout the pendency of the Chapter 11 Cases.

## C.     The Debtors' Secured and Unsecured Debt

19.     On or about November 15, 2022, TAAP IV entered into a loan agreement (the "Loan Agreement") with Rabo Ag, as administrative agent and lender, to provide TAAP IV with a term loan of up to $130 million (the "Term Loan") and delayed draw loans (the "Delayed Draw Loans") of up to $38 million, all upon the terms and conditions set forth herein (the "Loan").[5] As of the Petition Date, the Term Loan had been fully disbursed, and $29 million of Delayed Draw Loans were outstanding.

20.     All of the Debtor Farm Subsidiaries (collectively in this capacity, the "Guarantors") guaranteed repayment of the Loan pursuant to the Loan Agreement. Repayment of the Loan is secured by deeds of trust and fixture filings recorded against title to all of the Guarantors' real

---

[5] Subsequently, Rabo Ag assigned to Compeer Financial, FLCA, $15 million of Delayed Draw Loan commitment, and assigned to AgAmerica Lending LLC a further $15 million of its Delayed Draw Loan commitment (the foregoing collectively referred to herein as the "Lenders").

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

property. The Loan is also secured by a validly perfected lien in and to all of the Guarantors' other assets. (The Loan Agreement, the foregoing deeds of trust and all of the other documents entered into in relation to the Loan are hereinafter referred to collectively as the "Loan Documents"). TAAP IV and the Guarantors (collectively, the "Borrowers") also executed an Environmental Indemnity in favor of Rabo Ag and the Lenders.

21. On or about May 30, 2023, Rabo Ag executed a Waiver to Loan Agreement (the "Waiver"), pursuant to which it waived the following defaults under the Loan Agreement: Borrower's failure to timely deliver audited financial statements for the year ending December 31, 2022; and Borrower's failure to comply with the Current Ratio covenant of the Loan Agreement (Section 6.13.1) for the year ending December 31, 2022.

22. On or about February 6, 2024, Rabo Ag served Borrower and Guarantors with a Notice of Default and Imposition of Default Interest Under Loan Documents (the "Notice of Default"). The Notice of Default asserted an Event of Default under Section 9.1.12 of the Loan Agreement (impairment of ability to repay Loan as a result of a Material Adverse Effect) and a further Event of Default under Section 6.13.3 (a) (requiring a 60% loan to value ratio with respect to outstanding loans). Pursuant to the Notice of Default, Rabo Ag imposed the Default Rate with respect to the Term Loan and the Delayed Draw Loans, with a reservation of its other rights and remedies.

23. As of the Petition Date, the Loan balance was approximately $161 million, comprising $159 million in principal, plus approximately $1.8 million in interest (including default interest but excluding certain fees and costs) (the "Rabo Ag Debt").

24. Separately, WL Olives owes approximately $2 million to American Agcredit, FLCA ("AmAg"), secured by a first-priority lien and deed of trust encumbering the Olive JV's olive growing real estate. Neither WL Olives nor the Olive JV is a Debtor, but Debtor TAAP IV is a guarantor of WL Olives' obligation to AmAg, as is Westlake Farms, Inc., the other (non-Debtor) owner of the Olive JV.

25. In addition to the foregoing obligations, the Debtors (principally Trinitas Farming) owe approximately $27 million of general unsecured debt, principally related to operations and

related accounts payable. Of this amount, approximately $7.6 million is owed to Pomona Farming under the Farm Services Agreement.[6]

**D.      Events Leading Up to Chapter 11 Filing**

26.      Because of the advantages of the Portfolio's orchards, TF and Trinitas Partners' operating expertise, and the Debtors' significant cost-of-production advantages described above, the Debtors believe that their Portfolio has substantial long-term value that is greater than the amount of the Rabo Ag Debt. Over the medium-long term, prime California farmland with secure, reliable water rights and affordable water costs is poised to become more scarce, increasing the Portfolio's value. Nevertheless, a number of factors have led to the need to file these Chapter 11 Cases.

27.      First, and most importantly, almond prices are at or near record lows and have been at extremely low levels for over two years. The current average price of almonds is about $1.74 per pound, sharply below the trailing 10-year average almond prices of approximately $2.50 per pound. Adjusted for inflation, current prices are at an all-time low, and a significant portion of California's almond growers and producers are selling below their cost of production and operation. Unlike many other businesses and some other types of agriculture, almond farmers are not able to "turn off" their almond trees or "turn down" the trees by eliminating or dramatically reducing their farming activities in order to reduce expenses when almond prices are low. Doing so would kill or meaningfully impair the almond trees, destroying the stream of future almond production. Therefore, the Debtors' almond orchards need to be prudently farmed and operated until the market recovers and prices improve.

28.      Second, rising interest rates have dramatically increased the cost of debt service. While the Term Loan is a fixed rate loan, the Delayed Draw Loans are floating rate, pegged to SOFR (which has nearly doubled since the Debtors' entry into the Loan) and adjusted monthly.

---

[6] Pomona Farming advanced certain payments to TF for its pro rata share of costs and expenses incurred by TF for Pomona Farming's benefit for which TF did not pay the corresponding third-party vendors as of the Petition Date.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

As a result, the Debtors' quarterly interest payment obligations have increased significantly in the 15 months since the Loan was made and are now TAAP IV's largest expense category.

29.     Third, the Debtors' orchards are not yet old enough to generate mature production of almonds. As a result, they will require an additional two or so years of farming and operations before they are able to generate mature almond production and corresponding revenue, leading to the need to fund operating losses as a part of the normal development cycle of young almond orchards. (This need would exist even if almond prices suddenly reverted to normal ranges.) As such, the Debtors' operations remain cashflow-negative. The rising cost of capital has made the Debtors' capital needs harder to access.

30.     In May of 2023, Rabo Ag waived certain defaults under the Rabo Ag Debt (including the failure of the borrower to comply with its current ratio covenant under the loan), but financial and market factors have remained adverse.

31.     As a result of these adverse factors, in the first quarter of 2023, Trinitas Partners began consulting with TAAP IV's limited partners about how to address TAAP IV's liquidity shortfall. By the third quarter of 2023, the limited partners had already contributed the full amount of equity that they were committed to provide. Ultimately, the limited partners decided not to contribute additional capital. Instead, in consultation with each other, Trinitas Partners and the limited partners agreed to seek to dispose of some of the Portfolio's assets to generate liquidity.

32.     The Debtors and Rabo Ag began discussions in the middle of 2023 regarding a restructuring of the Rabo Ag Debt and/or a partial or complete sale of the Portfolio. In the months leading up to the Petition Date, the Debtors also, in consultation with Rabo Ag, continued to seek potential opportunities to sell some of the Portfolio, including the Olive JV, in order to pay down the Rabo Ag Debt and/or use the sale proceeds to fund working capital for the remaining orchards. Ultimately, however, the Debtors were unable to reach an agreement to sell any portion of the Portfolio on terms that were acceptable to the Debtors and Rabo Ag.

33.     Following discussions with Rabo Ag, the Debtors and Rabo Ag agreed that it would be in the best interests of the Debtors and their creditors for the Debtors to commence these proceedings and for Rabo Ag to provide debtor-in-possession financing, as described more fully

below, to fund an orderly and managed sale process of the Portfolio, as a whole or in lots, to pay off the Rabo Ag Debt and satisfy other outstanding debt.

34. Accordingly, on the Petition Date, the Debtors filed these Chapter 11 Cases.

## II.

## FIRST DAY MOTIONS[7]

### A. Joint Administration Motion

35. By the *Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases* (the "Joint Administration Motion"), the Debtors request entry of an order directing the joint administration of the Chapter 11 Cases and the consolidation thereof for procedural purposes only and granting certain related relief.

36. As described above, all of the Debtors are affiliated with each other.

37. I understand that the joint administration of the Chapter 11 Cases will have several benefits, including (a) permitting the Clerk of the Court to utilize a single general docket for these Chapter 11 Cases and combine notices to creditors of the Debtors' respective estates and other parties in interest; (b) avoiding the need for duplicative notices, motions and applications, thereby saving the Debtors' estates time and expense; (c) enabling parties in interest to have a single point of reference for all matters relevant to these Chapter 11 Cases; (d) significantly reducing the volume of pleadings that otherwise would be filed with the Clerk of this Court; (e) rendering the completion of various administrative tasks less costly; and (f) minimizing the number of unnecessary delays associated with the administration of separate chapter 11 cases.

### B. Schedules of Assets and Liabilities and Statements of Financial Affairs Motion

38. By the *Motion of Debtors Pursuant to 11 U.S.C. §§ 521(a) and 105(a), and Fed. R. Bankr. P. 1007(c) for Entry of an Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs* (the "Schedules and Statements Motion") the Debtors request entry of an order, substantially in the form attached to the Schedules and Statements Motion as

---

[7] Capitalized terms used in Part II of this Declaration but not otherwise defined shall have the meanings ascribed to them in the motions to which the paragraphs relate.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

Exhibit A, extending the initial fourteen (14) day period to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") by 30 days, allowing the Debtors a total of 44 days after the Petition Date to file their Schedules and Statements (the "Schedules and Statements Deadline"), without prejudice to the Debtors' right to request additional time if necessary.

39. As detailed above, there are nineteen total debtors in these Chapter 11 Cases. The Debtors do not currently have any of their own employees, but rather share the services of the employees of non-Debtor Pomona Farming pursuant to the Amended and Restated Farm Services Agreement. Collecting the necessary information to prepare the Schedules and Statements for all nineteen Debtors requires an enormous expenditure of time and effort on the part of the Debtors, their professionals, and the shared employees under the Amended and Restated Farm Services Agreement.

40. Moreover, the Debtors own and continue to operate orchards covering over 7,800 planted acres of land; February and March are critical months for almond ranches, when almond trees are pollinated and fertilized. The Debtors anticipate that their personnel, professionals, and shared employees will be occupied with the day-to-day operations of the almond ranches, in addition to working with their vendors and other counterparties in the wake of the bankruptcy filings. In addition, pursuant to the terms of the DIP Financing, the Debtors have committed to certain imminent sale milestones, including commencing an initial sale process in March 2024, which the Debtors expect will occupy much of their management's and professionals' time.

41. The Court's grant of a time extension to file the Schedules and Statements as requested in the Schedules and Statements Motion is appropriate in light of the circumstances. While the Debtors, with the services of the shared employees under the Amended and Restated Farm Services Agreement and the assistance of the Debtors' professional advisors, plan to work diligently and expeditiously to prepare the Schedules and Statements, the 14-day deadline is not achievable under the circumstances of these Chapter 11 Cases. The number of Debtors and the complexity of their businesses and finances, coupled with the limited time and personnel available to the Debtors and the substantial work involved in operating the Debtors' businesses and meeting

Keller Benvenutti Kim LLP
425 Market Street, 26th Floor
San Francisco, California 94105

1  the sale milestones as required under the DIP Financing, necessitate an extension of the Schedules

2  and Statements Deadline.  Accordingly, I believe that ample cause exists to extend the time for

3  filing the Schedules and Statements as requested in the Schedules and Statements Motion.

4  **C.** **Creditor Matrix Motion**

5  42.  By the *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A)*

6  *File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each*

7  *Debtor, and (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors; (II)*

8  *Implementing Certain Procedures for the Notice of Commencement; and (III) Granting Related*

9  *Relief* (the "Creditor Matrix Motion"), the Debtors request entry of an order, substantially in the

10  form attached to the Creditor Matrix Motion as Exhibit A, (i) authorizing the Debtors to (a) file a

11  consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor (the

12  "Creditor Matrix"), and (b) file a consolidated list of the Debtors' 30 largest unsecured creditors

13  in lieu of filing a separate top twenty creditor list for each Debtor (the "Top 30 List"); (ii)

14  implementing certain procedures for the mailing of the notice announcing the commencement of

15  these Chapter 11 Cases and the meeting of creditors to be held pursuant to section 341 of the

16  Bankruptcy Code (the "Notice of Commencement"); and (iii) granting related relief.

17  43.  I understand that the Bankruptcy Code requires that a debtor file a list of creditors.

18  There are 19 Debtors in these Chapter 11 Cases, comprised of TAAP IV and 18 of its wholly-

19  owned subsidiaries.  The Debtors operate as an integrated business and share cash management

20  and operational systems.  The Debtors submit that permitting them to maintain a single

21  consolidated Creditor Matrix, in lieu of maintaining a separate creditor matrix for each Debtor, is

22  warranted.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-

23  specific creditor matrix format would be an unnecessarily burdensome task and would result in

24  duplicate mailings.   Instead, the Debtors, in consultation with Donlin, Recano & Company, Inc.

25  ("Donlin Recano"), their proposed claims and noticing administrative agent, have determined that

26  utilizing their existing records to generate a consolidated Creditor Matrix will be the most efficient

27  use of the Debtors' resources, is in the best interests of the estates, and will not prejudice the

28

**KELLER BENVENUTTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

**KELLER BENVENUTTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

Debtors' creditors.  Accordingly, the Debtors seek authority to maintain a single, consolidated Creditor Matrix.

44.     I understand that under the Bankruptcy Rules, a debtor is required to file a list of its top 20 unsecured creditors (a "Top 20 List").  Because most of the Debtors are co-obligors and/or guarantors with each other with respect to their secured debt, and certain contractual, trade debt, and other obligations, the Top 20 Lists of the Debtors would inevitably overlap.  In addition, certain Debtors have fewer than twenty significant unsecured creditors.  Accordingly, the Debtors submit that filing separate Top 20 Lists for each Debtor would be of limited utility, and, instead, the exercise of compiling separate Top 20 Lists for each Debtor would be no more than an unnecessary expenditure of the Debtors' limited time and resources.  Further, the Debtors believe that a single, consolidated list of the Debtors' thirty largest unsecured creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.

45.     Accordingly, the Debtors submit that filing a consolidated list of their thirty largest unsecured creditors is necessary for the efficient and orderly administration of these Bankruptcy Cases, appropriate under the facts and circumstances, and in the best interests of the Debtors' estates.

**D.      Cash Management Motion**

46.     By the *Motion of the Debtors Pursuant to 11 U.S.C. §§ 105, 363, and 503(B) for Interim and Final Orders (I) Approving Continued Use of the Debtors' Cash Management System and Bank Accounts; (II) Authorizing the Debtors to Open and Close Bank Accounts; and (III) Authorizing Banks to Honor Certain Prepetition Transfers* (the "Cash Management Motion"), the Debtors seek entry of Interim and Final Orders, substantially in the forms attached to the Cash Management Motion as Exhibit A and Exhibit B, respectively, (i) approving the Debtors' use of their current Cash Management System (as described below) and existing Bank Accounts and waiving certain requirements set forth in the operating guidelines for debtors in possession to facilitate the administration of chapter 11 cases established by the United States Trustee (the "UST Guidelines"); (ii) authorizing, but not directing, the Debtors to open and close Bank Accounts; and (iii) authorizing, but not directing, all Banks to honor certain prepetition transfers.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

### 1. The Bank Accounts

47. Debtors currently have 20 accounts with First Republic, which is now part of JPMorgan Chase. Deposit products and related services are offered by JPMorgan Chase Bank, N.A., which is an FDIC-insured institution and a U.S. Trustee Authorized Depository for debtors in possession in the Northern District of California.

48. Each of the 18 Debtor Farm Subsidiaries has an account used for depositing receipts. TF has an account used for receipts and from which all of the Debtors' disbursements are paid. TF also has a payroll account from which it historically made payroll disbursements. Because the Debtors no longer have employees, the payroll account is no longer being used. TAAP IV also maintained an account in its name, which has since been transferred to TF.

49. The Debtor Farm Subsidiaries' accounts do not make disbursements to any account other than TF's disbursement account. The TF account is a net-zero pass-through account. Historically, cash would come in to the accounts of the Debtor Farm Subsidiaries or, to some extent, to the TF account.[8] On a monthly basis, TF would invoice each of the Debtor Farm Subsidiaries for services provided by TF, and each of the Debtor Farm Subsidiaries would transfer cash to the TF account, for TF to disburse to vendors to pay bills. Excess cash would remain at the Debtor Farm Subsidiaries' accounts.

50. The Cash Management System will be substantively the same postpetition, except that, pursuant to the Amended and Restated Farm Services Agreement, to the extent Pomona Farming provides services to the Debtors, TF will make a reimbursement payment to Pomona Farming, in addition to paying any outside vendors if TF or the Debtor Farm Subsidiaries are billed directly, for services rendered to the Debtors.

### 2. Cash Management System Fees

51. From time to time, and in the ordinary course of business, the Debtors incur obligations for the maintenance of the Cash Management System. These obligations primarily

---

[8] Almond processors typically send checks to the specific ranch with which they transact, although some processors send checks to TF. If TF has sufficient funds, it will send funds received directly from processors to the proper entity through an intercompany transfer; otherwise, it enters an intercompany payable.

consist of amounts owed to First Republic for the maintenance of and services related to the Bank Accounts ("Bank Fees"), together with other fees and obligations relating to the maintenance of the Cash Management System (together with the Bank Fees, the "Cash Management Fees"). The Cash Management Fees are based on the number and type of transactions. First Republic offsets the Cash Management Fees against credits to the Debtors based on usage and the cash balances maintained; therefore, the amount of the gross fees and charges is not readily accessible by Debtors. Historically, the credits have always completely offset the fees and charges, and the Debtors anticipate that any Cash Management Fees related to the prepetition period will continue to be offset entirely by credits owing to the Debtors, such that the Debtors will not bear any out-of-pocket expense with respect to the prepetition Cash Management Fees. As such, and to ensure that there is no disruption in the Debtors' operations and access to their bank accounts, the Debtors submit that it is in their best interests to authorize First Republic to charge prepetition Cash Management Fees, and the Debtors seek authority to pay, or allow First Republic to offset, any prepetition Cash Management Fees.

52. The Debtors' ability to continue to use their Cash Management System in the ordinary course of business is essential to their operations. If forced to abandon or modify their Cash Management System, the Debtors would have to significantly alter their business operations. The Cash Management System benefits the Debtors by enabling them to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce costs and administrative expenses by facilitating the movement of funds.

**E.     DIP Financing Motion**

53. By the *Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing; (II) Granting Liens and Superpriority Claims; (III) Authorizing the Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* (the "DIP Financing Motion"), the Debtors seek entry of an interim order, in substantially the form attached to the DIP Financing Motion as Exhibit A, and a second interim order and a final order in similar form, authorizing them to obtain $30 million of secured, superpriority postpetition financing on the terms detailed in the DIP Financing Motion.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

The interim orders sought by the Debtors also approve the immediate borrowing and use of $1 million of financing for the first week (the "Initial Draw"), and a supplemental $5.5 million of financing (the "Second Draw") (for a total of $6.5 million), on the terms described in the DIP Financing Motion, in order to enable them to continue operating their businesses between the Petition Date and a final hearing on the DIP Financing Motion (the "Interim Period").

54. As noted above, on or about February 6, 2024, Rabo Ag issued a Notice of Default and ceased funding the Debtors' operations. The Debtors and Rabo Ag were already in negotiations for Rabo Ag to finance the Debtors' operations in a chapter 11 proceeding, to provide for the continued development of the orchards, the continued operation of the Debtors' farming business and the orderly sale and disposition of its assets. Those negotiations, which were conducted at arm's length and required the resolution of numerous issues, culminated in an agreement, the material terms of which are set forth in the Term Sheet. It is the intent of the parties to further memorialize their agreement in a formal DIP Credit Agreement, but they were unable to do so prior to the Petition Date. The parties expect the DIP Credit Agreement to be executed within the next several days and will submit it to the Court for approval, together with a longer-term interim financing budget, at a second interim hearing, which the Debtors request be set for on or about February 28, 2024, at the Court's convenience. In the meantime, the Debtors seek approval of an interim order which will provide for funding an Initial Draw of $1 million in accordance with the budget attached to the DIP Financing Motion as Exhibit C (as the same is further updated and amended, the "Budget"). The Debtors will present a longer-term interim budget at the continued interim hearing on the DIP Financing Motion.

55. The material terms and conditions of the DIP Loan are set forth above in the DIP Financing Motion and are, in the Debtors' opinion and that of its financial advisor, Arch + Beam Global LLC ("Arch + Beam"), fair and reasonable under all of the relevant circumstances. After Rabo Ag indicated that it would be willing to provide debtor-in-possession financing, and while the terms of the proposed DIP facility were being negotiated, Arch + Beam, at the Debtors' direction, reached out to 9 potential third-party DIP lenders, to see if the Debtors could find comparable or better terms for debtor-in-possession financing from a lender other than Rabo

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

Ag. The potential lenders to whom Arch + Beam reached out included a diverse range of commercial banks, specialty asset-based lenders, and investment funds known to Arch + Beam. Eight of the potential lenders passed on the opportunity because they were not willing to lend on agriculture assets at this time or to provide DIP funds on a junior secured basis or to prime a prepetition secured lender without the secured lender's consent. The ninth potential lender would only consider lending at a rate that was substantially higher than the interest rate under the DIP Loan. In other words, none of the parties Arch + Beam contacted was willing to provide DIP funds at comparable or better terms than the terms of the DIP Loan. As a result of these efforts, the Debtors concluded that they would not be able to obtain financing on terms more favorable than those negotiated with Rabo Ag, and that they certainly would not be able to obtain such financing without affording the lender a priming lien on the assets securing the prepetition loan from Rabo Ag.

56. The Debtors have an urgent need for funding to maintain the continuity of their operations and the going concern of their business and assets. The Debtors enter these Chapter 11 Cases with almost no cash, during a critical period in the almond-growing season, when the Debtors must incur substantial costs to support the cultivation, pollination and fertilization of the crop, as well as general and administrative expenses. As the Budget indicates, the Debtors need approximately $1 million of liquidity to fund their operations during the first week of the Chapter 11 Cases, while the parties finalize definitive documentation of the DIP Loan. The Debtors' funding needs for the first five weeks of the Chapter 11 Cases total nearly $6.5 million. The cost of irrigation, fertilizers, chemicals, and pollination alone—without which the Debtors will not be able to support their almond orchards—exceeds $520,000 during the first week of the Chapter 11 Cases and $2.2 million during the first five weeks of the postpetition period. The remainder of the Debtors' funding needs for the first five weeks of the Chapter 11 Cases includes other costs and expenses necessary to preserve the value of the orchards and the crop and maintain the Debtors' operations and administer these Chapter 11 Cases. Any disruption of operations during the pollinating and growing season could severely and adversely impact the quality, yields, and value of this year's crop and, accordingly, the value of the Debtors' business and assets.

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

57.     Absent authorization from the Court to access the Initial Draw and the Second Draw under the DIP Loans on an interim basis pending a Final Hearing, the Debtors and their creditors will be immediately and irreparably harmed.  Access to the DIP Loan during the Interim Period will provide the Debtors sufficient liquidity to stabilize their operations and fund the administration of these Chapter 11 Cases.  Specifically, the DIP Loan will allow the Debtors to continue to fund pollination across their orchards, purchase and apply chemicals and fertilizers necessary to the orchards, and compensate the contractors, vendors and professionals that oversee the Debtors' daily operations.

**F.     Taxes Motion**

58.     By the *Motion of the Debtors Pursuant to 11 U.S.C. §§ 105, 363, and 507(a) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Authority to Pay Certain Prepetition Taxes and Assessments and Granting Related Relief* (the "Taxes Motion"), the Debtors request entry of interim and final orders, in substantially the form attached to the Taxes Motion as Exhibit A and Exhibit B, respectively, authorizing but not directing them to pay prepetition taxes, assessments, fees, and other charges in the ordinary course of business, including any such taxes, assessments, fees, and charges subsequently determined upon audit, or otherwise, to be owed (collectively, the "Taxes and Assessments"), and other related relief.

59.     In the ordinary course of operating their businesses, the Debtors incur a variety of Taxes and Assessments that they remit periodically to various federal, state, and local taxing, licensing, and other governmental authorities (collectively, the "Taxing Authorities").  A list of the Taxing Authorities is annexed to the Taxes Motion as Exhibit C (the "Taxing Authorities List").

60.     As set forth in further detail below, the Debtors generally pay the Taxes and Assessments semi-annually or annually, as required by applicable laws.  As of the Petition Date, the Debtors estimate that an aggregate amount of approximately $847,216 in Taxes and Assessments are due and owing to the various Taxing Authorities, of which approximately $244,860 relates to the prepetition period and approximately $602,357 relates to the postpetition period.  A chart outlining the various categories and approximate amounts of the prepetition Taxes

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

and Assessments that the Debtors are seeking authority to pay pursuant to the Taxes Motion is set forth below. The amounts of the Taxes and Assessments set forth below are good faith estimates based on the Debtors' books and records and remain subject to potential audits and other adjustments. As such, the Debtors also seek authority to pay any Taxes and Assessments due and owing following any such audit and adjustment.

| Categories of Taxes and Assessments | Approx. Prepetition Amount Seeking Authority to Pay on Final Basis |
|---|---|
| Real Property Taxes | $228,547 |
| Personal Property Taxes | $6,913 |
| Business License Fees | $14,400 |
| **Total Taxes and Assessments** | $244,860 |

       1.       **Property Taxes**

61.     The Debtors operate multiple ranches in the Central Valley of California and pay annual taxes to various Taxing Authorities on account of the Debtors' real property (collectively, the "Real Property Taxes"). As of the Petition Date, the Debtors owe approximately $844,225 in Real Property Taxes, which were due as of February 1, 2024, and which will be delinquent if not paid by April 10, 2024, and therefore are all due and payable within the interim period. The Real Property Taxes owed are for the period from January 1, 2024, through June 30, 2024. The pro rated prepetition portion of the Real Property Taxes is $228,547. By the Taxes Motion, the Debtors seek authority to pay, on both an interim and final basis, an amount not to exceed $250,000 in prepetition Real Property Taxes. The Debtors will also pay postpetition Real Property Taxes as they come due, subject to the DIP budget.

62.     In addition, the Debtors have an obligation to pay personal property taxes (collectively, the "Personal Property Taxes"). As of the Petition Date, the Debtors owe approximately $2,991 in Personal Property Taxes, for the period from July 1, 2023, through June 30, 2024. Some or all of the Personal Property Taxes may be due and payable within the interim period. The pro rated prepetition portion of the Personal Property Taxes is $1,913. By the Taxes Motion, the Debtors seek authority to pay, on both an interim and final basis, an amount not to

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

exceed $7,000 in prepetition Personal Property Taxes, which amount would include unidentified prepetition Personal Property Tax payments that may arise. The Debtors will also pay postpetition Personal Property Taxes as they come due, subject to the DIP budget.

**2. Business License Fees**

63. The State of California Franchise Tax Board requires limited liability companies ("LLCs") to pay an annual tax of $800 (the "Business License Fees"), payable on the 15th day of the 4th month from the date the LLC files its articles of organization with the Secretary of State. As of the Petition Date, the Debtors owe no more than $14,400 in Business License Fees, some or all of which may be due and payable within the interim period. By the Taxes Motion, the Debtors seek authority to pay Business License Fees relating to the prepetition period on an interim and final basis, in an amount not to exceed $16,000. The Debtors will also pay postpetition Business License Fees as they come due, subject to the DIP budget.

64. I understand that most, if not all, of the Taxes and Assessments are afforded priority status under the Bankruptcy Code. As such, the relief requested in the Taxes Motion will only affect the timing of the payment of the Taxes and Assessments and will not prejudice the rights of general unsecured creditors or other parties in interest. I also understand that, under applicable state and local law, interest and penalties may accrue for nonpayment of certain Real Property Taxes and Personal Property Taxes due and owing, and obligations to pay Real Property Taxes and Personal Property Taxes can be secured by a lien on the subject property for which the taxes are incurred. Therefore, paying such obligations as requested in the Taxes Motion will conserve resources and is in the best interests of the Debtors' estates and all parties in interest.

**G. Utilities Motion**

65. By the *Motion of the Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 for Interim and Final Orders Establishing Adequate Assurance Procedures with respect to the Debtors' Utility Providers* (the "Utilities Motion"), the Debtors request an order (i) establishing procedures for addressing any requests that a utility company (collectively, the "Utility Companies" and each, individually, a "Utility Company") may make for additional assurance of payment; (ii) prohibiting the Utility Companies from altering, refusing or discontinuing services to, or discriminating

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

against the Debtors; (iii) approving an adequate assurance deposit as adequate assurance of post-petition payment to the Utility Companies; and (iv) granting certain related relief.

66.     The Debtors rely on utility services, including, but not limited to, telephone, internet, gas and electric, and waste removal services (collectively, the "Utility Services") provided by the Utility Companies, including those identified on Exhibit A to the Utilities Motion (the "Utility Service List"), to operate their businesses.[9]  As discussed above, the Debtors operate 17 almond ranches covering over 7,000 acres of land, the operations of which heavily depend on the Utility Services, for, *inter alia*, irrigation, waste management, and harvesting, which are essential components in maintaining the health and productivity of the almond orchards.  Uninterrupted service from the Utility Companies is essential to administering these Chapter 11 Cases.  Any temporary or permanent discontinuation of Utility Services could irreparably disrupt the orderly administration of these cases, damage the Debtors' assets, and, as a result, diminish recoveries to the Debtors' stakeholders and secured lender.

67.     Section 366(c)(2) of the Bankruptcy Code requires the Debtors to provide the Utility Companies with "adequate assurance of payment" within thirty days of the commencement of these cases to prevent the Utility Companies from altering, refusing or discontinuing service.  The Debtors propose to provide "adequate assurance" in two ways:  First, they intend to pay any postpetition obligations to the Utility Companies in a timely fashion in the ordinary course of business.  Those payments are provided for in the post-petition financing, for which the Debtors seek concurrent approval.  Second, the Debtors propose to deposit, as further adequate assurance of payment, $275,000.00[10] (the "Adequate Assurance Deposit") into a segregated account (the

---

[9] For each Utility Company, Exhibit A identifies, to the extent known: (i) the name and type of service of the Utility Company and (ii) the address for the Utility Company.  The inclusion of any entity on, or any omission of any entity from, Exhibit A is not an admission by the Debtors that such entity is or is not a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve their rights with respect thereto.  In addition, the Debtors are requesting that the Utilities Motion apply to all of their utility companies, whether or not any given utility company is included on the Utility Service List.

[10] The Debtors have calculated that their average monthly expenditure for Utility Services attributable to the Debtors' operations is $275,000.  This figure is based on the average monthly charges incurred in the operation of the Debtors' ranches over the twelve-month period prior to the Petition Date.  As discussed above, under the Original Farm Services Agreement (since amended), Trinitas Farming incurred some costs, including utility costs, relating to non-Debtor

"Adequate Assurance Account") within 20 days of the Petition Date. The Adequate Assurance Deposit equals approximately one month of the Debtors' estimated utility expenses for those Utility Services, based on the Debtors' historical expenses incurred over the last twelve months. The Adequate Assurance Deposit, together with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes adequate assurance of future payment to the Utility Companies.

*[Signature on next page]*

**KELLER BENVENUTTI KIM LLP**
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105

---

ranches, which costs were then allocated to such other non-Debtor ranches, and, as such, the utility service charges historically billed to Trinitas Farming in the first instance include charges attributable to, and ultimately borne by, non-Debtor ranches. In connection with the Amended and Restated Farm Services, accounts for any non-Debtor ranches previously paid by Trinitas Farming and then reimbursed by Pomona Farming will be transferred to Pomona Farming, thus reducing post-petition utility charges invoiced to the Debtors.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Laguna Beach, California, on February 19th, 2024.

/s/ Kirk Hoiberg
Kirk Hoiberg

KELLER BENVENUTTI KIM LLP
425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105